UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| CRYSTAL JANEEN DONALD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 3:17-CV-072-JD |
| | ) |
| NANCY A. BERRYHILL, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

Crystal J. Donald is a 47 year old woman who, from late 2012 until now, has dealt with a host of medical issues. Ms. Donald filed applications for Title II and Title XVI benefits[1] on October 24, 2012, alleging disability beginning on September 28, 2012. Ms. Donald's claims and requests for reconsideration were denied.[2] After requesting an administrative hearing, Ms. Donald appeared for a hearing in January 2015, where (in relevant part) she and medical expert Dr. Bernard Stephens ("ME") testified. Ms. Donald also appeared at a supplemental hearing in June 2015, where she and a vocational expert ("VE") testified. Ultimately, the Administrative Law Judge ("ALJ") concluded that Ms. Donald could perform other light work in the economy and issued an unfavorable decision. The Appeals Council denied Ms. Donald's request for review. Ms. Donald then filed this action seeking judicial review of that decision, thereby

---

[1] The regulations governing the determination of disability for disability insurance benefits ("DIB") are found at 20 C.F.R. § 401.1501 *et seq.*, while the supplemental security income regulations are set forth at 20 C.F.R. § 416.901 *et seq*. Because the definition of disability and the applicable five-step process of evaluation are identical in all respects relevant to this case, reference will only be made to the regulations applicable to DIB for clarity.

[2] In early 2013, state agents opined that despite Ms. Donald's respiratory and mental disorders, and her moderate difficulties with performing work at a consistent pace, Ms. Donald could still perform unskilled light work [R. at 109-58].

invoking this Court's jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3). For the following reasons, the Court remands this matter to the Commissioner for further proceedings.

## I. FACTUAL BACKGROUND

Since Ms. Donald's two week hospital stay in September 2012 for a pulmonary embolism and hypertension, she has consistently sought treatment for her medical problems and ongoing pain. In fact, the ALJ determined that she suffered from a long list of severe impairments, including: morbid obesity, status post pulmonary embolism (controlled with current coumadin therapy), degenerative disc disease of the lumbar spine and right knee, obstructive pulmonary disease, tobacco use disorder, and mood disorder. The details of Ms. Donald's treatment record and the proceedings before the ALJ are detailed below.

A. <u>Treatment Records</u>

On October 16, 2012, Ms. Donald presented to treating physician, Dr. Elizabeth Weston-Hammang, for a follow-up with her hypertension and pulmonary embolism. [R. at 516-19]. Dr. Weston-Hammang diagnosed Ms. Donald with pulmonary embolism and benign hypertension, and noted her tobacco use. Ms. Donald was prescribed hydrochlorothiazide, norvasc, coumadin, and nicotine patches.

About a month later, Ms. Donald presented to Dr. Elizabeth Weston-Hammang complaining of fatigue, memory loss, and nosebleeds. [R. at 544-46]. Dr. Weston-Hammang diagnosed Ms. Donald with long-term use of anticoagulants, fatigue, and tobacco use. Dr. Weston-Hammang ordered lab tests and prescribed ativan and an increased dose of nicotine patches.

On August 15, 2013, Ms. Donald presented to Dr. Weston-Hammang complaining of shortness of breath and pain in her back and right knee. [R. at 684-91]. Ms. Donald had labored breathing, but she was negative for wheezing, chest pain, irregular heartbeat, or palpitations. A

chest x-ray revealed normal exam findings. Dr. Weston-Hammang diagnosed Ms. Donald with long-term use of anticoagulants, osteoarthritis in the lower leg, shortness of breath, controlled hypertension, and right knee pain. Ms. Donald was prescribed nicotine patches and ativan, and she was referred to physical therapy for her right leg. One month later, Ms. Donald's physical therapist reported that despite Ms. Donald's sporadic attendance, Ms. Donald's pain was decreased, she had met her goals, and she would be discharged from therapy. [R. at 675-79].

On December 3, 2013, Ms. Donald presented to Dr. Weston-Hammang after she was involved in a motor vehicle accident. [R. at 666-70]. Ms. Donald's lumbar spine and right knee were tender. X-rays completed the same day suggested a paracervical myofascial strain and mild bilateral sacroiliitis appearing degenerative. Dr. Weston-Hammang observed that Ms. Donald's pain was aggravated by sitting or standing, and was relieved by lying flat.

On July 10, 2014, Ms. Donald presented to Dr. Weston-Hammang complaining of back pain, after she was in the emergency room the previous day for the same complaint. [R. at 653-59, 714-15]. Ms. Donald had labored breathing and slight shortness of breath while sitting and walking. She also presented with moderate back pain in the lumbosacral spine which radiated to the left foot and was exacerbated by movement.

On April 2, 2015, Dr. Weston-Hammang observed that Ms. Donald was fatigued and had visual aura, labored breathing, chest pain, and an irregular heartbeat. Ms. Donald also demonstrated extremity weakness, gait disturbance, and anxiety. [R. at 741-47]. Dr. Weston-Hammang diagnosed Ms. Donald with unspecified essential hypertension, long-term use of anticoagulants, sciatica, shortness of breath, acute chest pain, acute sinusitis, and acute anxiety. Dr. Weston-Hammang prescribed Ms. Donald the following: (1) acetaminophen with codeine; (2) albuterol sulfate; (3) coumadin; (4) gabapentin; (5) hydrochlorothiazide; (6) norvasc; and (7)

3

temaszepam. Dr. Weston-Hammang reported that Ms. Donald may have chronic obstructive pulmonary disease and so she ordered additional lab work.

On June 16, 2015, Dr. Weston-Hammang filled out a physical residual functional capacity ("RFC")[3] questionnaire for Ms. Donald indicating that she had instructed Ms. Donald to raise her right leg above the level of her heart for two hours "as needed," in order to reduce the swelling in her knee. Dr. Weston-Hammang noted that Ms. Donald was prescribed medication to help with her edema, which was caused by her hypertension and obesity.

B. State Agency Records

On January 28, 2013, Ms. Donald presented to Dr. Ralph Inabnit for a disability examination. [R. at 561-68]. Ms. Donald reported that she did no housework, laundry, or shopping, but that she could care for herself. On examination, Ms. Donald's lungs were clear and her heart sounded normal, but it was noted that she had diminished breath sounds and suffered from pulmonary embolism and chronic obstructive pulmonary disease. Neurologically, Ms. Donald was documented as being alert, oriented, and of normal intelligence. Ms. Donald's spine had a normal range of motion and her gait was normal. It was noted that Ms. Donald could walk a block and lift twenty pounds, but then she would be out of breath. Dr. Inabnit concluded that there was evidence that Ms. Donald suffered from obesity, hypertension, memory impairment, chronic fatigue, and a history of pulmonary emboli. Dr. Inabnit recommended a neuropsychological evaluation for her cognitive decline, along with smoking cessation, a pulmonary function test, chest x-rays, weight loss, and a follow-up on her high blood pressure.

On February 2, 2013, Ms. Donald visited Kent Hershberger, Ph. D., for a Mental Status Evaluation. [R. at 570-75]. Dr. Hershberger opined that Ms. Donald suffered from panic disorder

---

[3] RFC is defined as the most a person can do despite any physical and mental limitations that may affect what can be done in a work setting. 20 C.F.R. § 404.1545.

4

and adjustment disorder with depressed mood and anxiety. Dr. Hershberger was unsure whether Ms. Donald's adjustment disorder would progress into major depression in the future. Dr. Hershberger added a caveat that his evaluation might be a "mild" underestimate of Ms. Donald's capabilities, because Ms. Donald did not appear to put forth a full effort during her examination. Ultimately, Dr. Hershberger opined that Ms. Donald's interpersonal skills were fairly good and she could get along adequately with coworkers. He further indicated that she would be capable of simple repetitive tasks, taking directions from supervisors, and learning simple new vocational skills, even though her stress tolerance was below average and she was not fully oriented.

On January 23, 2015, Ms. Donald was seen by Dr. Gupta for a physical examination and pulmonary function test. [R. at 717-31]. Other than noting that Ms. Donald was obese and fatigued, and noting that she suffered from chest pain and shortness of breath upon exertion, the physical examination was largely unremarkable. Dr. Gupta's impression was that Ms. Donald had a history of pulmonary embolism, benign hypertension, panic attacks, agoraphobia, and depression. The pulmonary function test indicated that Ms. Donald suffered from moderate obstruction.[4]

Dr. Gupta also completed a Medical Source Statement which assessed Ms. Donald's ability to perform work-related activities from a physical perspective. Dr. Gupta opined that Ms. Donald could lift and carry up to 10 pounds continuously, 11-20 pounds frequently, and 21-50 pounds occasionally. Dr. Gupta reported that without breaks, Ms. Donald could sit for eight hours, but could only stand and walk for two hours in a work day.

On January 27, 2015, Ms. Donald presented to Patrick W. Utz, Ph.D., a psychologist, for a mental status evaluation. [R. at 734-40]. On examination, Utz reported that Ms. Donald's

---

[4] This information is taken from the report itself [R. at 728-31] which does not require reliance on the plaintiff's contested supplemental exhibit that generally explains spirometry results. [DE 24-2].

memory was quite good, she manifested good social skills with no signs of social anxiety, and she reported being able to fully care for herself. He also noted that Ms. Donald's daughters take care of the cooking, cleaning, and washing of dishes. In conclusion, he believed that while Ms. Donald experienced periods of loneliness and "worrisome times," there were no signs of major depression or anxiety. Utz also completed a Medical Source Statement which assessed Ms. Donald's ability to perform work-related activities from a mental perspective. He opined that Ms. Donald had no work-related restrictions with respect to understanding, remembering, and carrying out simple instructions or making judgments on simple work-related decisions, but that she did have mild limitations with respect to complex instructions. He also believed that Ms. Donald had no work-related limitations relative to being able to appropriately interact with others.

    C.  <u>Administrative Hearings</u>

During the administrative hearings before the ALJ [R. at 29-108], Ms. Donald described her difficulties with anxiety and remembering things. She also explained that she suffers from shortness of breath and insomnia, and that she is unable to cook or clean without having to take breaks and sit down because she gets winded. Further, her back and knee pain keep her from standing longer than ten minutes, walking beyond one block, and climbing more than seven steps. To alleviate the pain and swelling, Ms. Donald testified that throughout the day she must elevate her right leg a couple of feet from the floor for about an hour. She also confirmed taking a long list of medications which make her tired.

The ME's January 2015 testimony indicated that Ms. Donald could perform light work with some environmental and other limitations. However, the ME noted that his opinion did not take into account Ms. Donald's psychiatric issues, nor could he indicate whether the results from

6

a pulmonary function test[5] (which had yet to be performed at the time) would alter his opinion about Ms. Donald's RFC.

   D. ALJ's Decision

In deciding the type of work that Ms. Donald could perform, the ALJ rested on the VE's testimony—that based strictly on the hypothetical (which mirrored the assessed RFC[6]), Ms. Donald would not be able to perform her past work, but she could perform unskilled light work as a maid/housekeeper and mailroom clerk. The VE acknowledged that if an individual had to elevate her leg any higher than six inches or if she would be off-task fifteen percent of the time, then that person would be unemployable.

In determining Ms. Donald's RFC, the ALJ relied heavily on the opinions of the state agents. But the ALJ discounted Dr. Gupta's standing/walking restriction as "not generally supported by the record," which the ALJ noted actually revealed that Ms. Donald had a normal gait and normal lower extremity strength and range of motion. The ALJ also gave little evidentiary and no controlling weight to the opinion of Dr. Weston-Hammang, with respect to Ms. Donald's needing to elevate her leg above the level of her heart.

## II. STANDARD OF REVIEW

Because the Appeals Council denied review, the Court evaluates the ALJ's decision as the final word of the Commissioner of Social Security. *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). This Court will affirm the Commissioner's findings of fact and denial of

---

[5] Such a test would provide the level of Ms. Donald's lung functioning given her complaints of experiencing shortness of breath. [R. at 95, 104-07].

[6] Specifically, the ALJ found that Ms. Donald was able to perform light work with the following limitations: no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps or stairs, balancing, stooping, crouching, kneeling, and crawling; no concentrated exposure to extreme cold and heat, uneven terrain, wetness and humidity, and respiratory irritants; no exposure to dangerous moving machinery; involving simple tasks at a variable pace with only end of the day production requirements, and no other periodic or hourly production quotas, with only occasional interaction with the public, coworkers, and supervisors.

7

disability benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). This evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Thus, even if "reasonable minds could differ" about the disability status of the claimant, the Court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

It is the duty of the ALJ to weigh the evidence, resolve material conflicts, make independent findings of fact, and dispose of the case accordingly. *Perales*, 402 U.S. at 399–400. In this substantial-evidence determination, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Nevertheless, the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision. *Id.* An ALJ must evaluate both the evidence favoring the claimant as well as the evidence favoring the claim's rejection and may not ignore an entire line of evidence that is contrary to his or her findings. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). Consequently, an ALJ's decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez*, 336 F.3d at 539. While the ALJ is not required to address every piece of evidence or testimony presented, the ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

### III. DISCUSSION

Disability benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998).

Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations create a five-step sequential evaluation process to be used in determining whether the claimant has established a disability. 20 C.F.R. § 404.1520(a)(4)(i)-(v). The steps are used in the following order:

1. Whether the claimant is currently engaged in substantial gainful activity;

2. Whether the claimant has a medically severe impairment;

3. Whether the claimant's impairment meets or equals one listed in the regulations;

4. Whether the claimant can still perform past relevant work; and

5. Whether the claimant can perform other work in the community.

*See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). At step three, if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations, disability is acknowledged by the Commissioner. *See* 20 C.F.R. § 404.1520(a)(4)(iii). However, if a listing is not met, in between steps three and four, the ALJ must then assess the claimant's RFC, which, in turn, is used to determine whether the claimant can perform her past work under step four and whether the claimant can perform work in society at step five. 20 C.F.R. § 404.1520(e). The claimant has the initial burden of proof in steps one through four, while the burden shifts to the Commissioner in step five to show that there are a significant number of jobs in the national economy that the claimant is capable of performing. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

Ms. Donald raises several issues. However, only one issue requires a detailed discussion because its logical bridge is not sound—that is, the ALJ's decision to discount Dr. Gupta's opinion in so far as it limited her ability to walk/stand[7] was not based on substantial evidence.

A. Dr. Gupta's Opinion

After Ms. Donald applied for disability benefits and even after the first administrative hearing, Dr. Gupta examined Ms. Donald on behalf of the Social Security Administration. *See* 20 C.F.R. §§ 404.1519, 416.919 (establishing such consultative examinations for applicants seeking, respectively, disability insurance benefits and supplemental security income). In relevant part, his opinion was that Ms. Donald's medical problems restricted her ability to walk and stand to only two hours each during the workday. Essentially, such a finding would have limited Ms. Donald to sedentary work. 20 C.F.R. § 404.1567(a); SSR 83–10.

The ALJ gave only "partial weight" to Dr. Gupta's report, even though he examined Ms. Donald in person on behalf of the agency. As a general rule, an ALJ is not required to credit the agency's examining physician in the face of a contrary opinion from a later reviewer or other compelling evidence. *Beardsley v. Colvin*, 758 F.3d 834, 839–40 (7th Cir. 2014). But rejecting or discounting the opinion of the agency's own examining physician supporting a disability finding (or further limitations, as happened here), can be expected to cause a reviewing court to take notice and await a good explanation for this unusual step. *Id.* (citing *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) ("An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice."); 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1)

---

[7] The ALJ's opinion misstated the restriction as one concerning the ability to "sit and/or walk" [R. at 19], but this was merely a scrivener's error since Dr. Gupta's report indicated that Ms. Donald could perform seated work for eight hours.

10

("Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you."). The problem in this case is that the ALJ did not provide an adequate explanation for discounting Dr. Gupta's opinion, nor for preferring the non-examining ME's analysis over that of the agency's examining doctor.

The ALJ's explanation for discounting Dr. Gupta's opinion with respect to Ms. Donald's ability to stand and/or walk for only two hours, was that the statement was not "generally support[ed] by the record, which shows that the claimant often showed normal gait, normal lower extremity strength, and normal range of motion in the lower extremities." [R. at 19]. But the mere fact that Ms. Donald's records contain unremarkable findings with respect to the strength and movement of her legs, says little (if anything) about Ms. Donald's ability to sustain light work given her documented shortness of breath upon exertion. In fact, not only did Dr. Gupta document that Ms. Donald suffered from obesity, fatigue, chest pain, and shortness of breath; but, he was the only doctor who performed and considered the pulmonary function test results revealing moderate obstruction. Moreover, Dr. Gupta's findings were consistent with (and supported by) medical findings by Dr. Weston-Hammang rendered less than three months later, which documented Ms. Donald as suffering from labored breathing, chest pain, and an irregular heartbeat requiring further workup. Therefore, while the Court recognizes that ALJ's are not required to adopt any particular administrative medical findings, these consultants are highly qualified and experts in Social Security disability evaluation. 20 C.F.R. § 404.1513a(b)(1). And here, the ALJ's reliance on normal physical exam results of Ms. Donald's legs does not alone support giving less weight to Dr. Gupta's views relative to Ms. Donald's exertional capacity in light of her breathing troubles during activity.

The gap in the ALJ's analysis in this respect cannot be filled by the ALJ's giving of "great weight" to the ME's testimony in this case. The regulations indicate that because non-examining sources have no examining or treating relationship with the claimant, "the weight [the ALJ] will give their medical opinions will depend on the degree to which they provide supporting explanations for their medical opinions." 20 C.F.R. § 404.1527(c)(3). Here, the ME conducted a file review and never examined Ms. Donald. During the January 5, 2015 administrative hearing, the ME opined that Ms. Donald was capable of performing light work. But the results from the pulmonary function test and Dr. Gupta's examination from January 23, 2015, were not provided for the ME's review. And, it does not appear that the ALJ ever re-contacted the ME to determine if his RFC determination would change based on the additional evidence. *See Staggs v. Astrue*, 781 F.Supp.2d 790, 794–96 (S.D. Ind. 2011) (finding that the medical record omitted from review provided "significant substantive evidence" regarding the claimant's medical impairments and that any medical opinion rendered without taking this record into consideration was "incomplete and ineffective."). The new reports concerning Ms. Donald's breathing and chest problems was highly relevant especially since the ME left open the possibility that new pulmonary function test results could alter his RFC assessment.

The same problem exists with the ALJ's reliance on the remaining state agent opinions, all of which were rendered between January and May of 2013. These state agents did not have access to the records identified immediately above, nor did they have access to almost two years' worth of records evidencing that Ms. Donald suffered from symptoms of shortness of breath upon exertion. For example, as early as August 2013, Dr. Weston-Hammang diagnosed Ms. Donald with shortness of breath, and again in July 2014, it was observed that Ms. Donald was having labored breathing and slight shortness of breath while sitting and walking. In short, there

is a significant amount of medical evidence in the record indicating that Ms. Donald's respiratory symptoms caused her to have exertional limitations. Beyond noting that Ms. Donald exhibited a normal range of motion and strength in her legs, the ALJ provided no adequate explanation for thinking that Ms. Donald was able to spend so much time on her feet, let alone without a sit/stand option.[8]

As such, there is not substantial evidence in the record to support a finding that the ME (or other state agents) had properly incorporated all of Plaintiff's limitations when determining her RFC. Thus, before the ALJ rested his ultimate RFC determination on the ME's testimony, he should have re-contacted the doctor to clarify whether the additional evidence of further limitations contradicted his initial assessment. On remand, the ALJ will have this opportunity, along with the chance to explain his rationale behind the weight he affords the other state agent opinions.

Ultimately, the ALJ's errors require remand because the ALJ must determine an individual's RFC, meaning "what an individual can still do despite his or her limitations," based upon all of the relevant evidence in the record, even as to limitations that are not severe. SSR 96–8p. In addition, the RFC assessment must "[c]ontain a thorough discussion and analysis of the objective medical and other evidence." *Id*. However, the ALJ's opinion in this case fails to provide an adequate discussion of the medical evidence (and more particularly, the weight afforded to it) which was then relied upon to formulate the ALJ's RFC assessment.

Remand will also provide an opportunity for the ALJ to expound upon and/or correct a few miscellaneous matters. For instance, the ALJ should take the opportunity to further explore

---

[8] This determination also appears critical given that the VE who testified at the first hearing seemed to indicate that a sedentary exertional level or a sit/stand option might exclude work in light of Ms. Donald's limitations with social interaction. [R. at 101-03].

13

"when or how often" Ms. Donald is required to elevate her leg in order to prevent edema (consistent with Dr. Weston-Hammang's June 2015 record), especially in light of the VE's testimony that such a restriction could render Ms. Donald unemployable. Furthermore, in determining whether Ms. Donald is credible, the ALJ may not discount Ms. Donald's pulmonary limitations (as he did), because she continued to smoke, without considering other factors, such as the addictive nature of the product, which impacts her ability to stop smoking (as demonstrated by her ongoing prescription for nicotine patches). *See Shramek v. Apfel*, 226 F.3d 809, 813 (7th Cir. 2000) (discussing how the failure to stop smoking, even against medical advice, is an unreliable basis on which to rest a credibility determination). Nor should the ALJ overstate how Ms. Donald performed various daily activities, given her claimed need to take many breaks and be assisted by others, along with her demonstrated problems with maintaining concentration, persistence, and pace. *See Beardsley v. Colvin*, 758 F.3d 834, 838–39 (7th Cir. 2014) (the ALJ must consider how self-reported daily activities are removed from the demands and pressures of a regular workplace where the claimant would be required to sustain activity for most of the workday).

    B. <u>Step Five</u>

Ultimately, without the RFC determination being supported by substantial evidence, the Court is unable to rely on the ALJ's determination that Ms. Donald is capable of performing other work (step 5). More accurately stated, in deciding what work Ms. Donald was capable of performing, the ALJ relied on the VE's testimony, which in turn, relied on the ALJ's hypothetical question that incorporated the inadequately supported RFC determination. For this reason, the VE's testimony cannot be relied upon as an accurate indicator for the type of work

that Ms. Donald is capable of performing.[9] *See Young v. Barnhart*, 362 F.3d 995, 1003-05 (7th Cir. 2004) (the ALJ must determine the claimant's RFC before performing steps 4 and 5 because a flawed RFC typically skews questions posed to the VE); SSR 96-8p. Thus, until the hypotheticals presented to the VE include the functional limits that the ALJ accepts as credible, and the ALJ adequately explains Ms. Donald's actual limitations and resulting RFC based on the relevant medical evidence, 20 C.F.R. §§ 404.1545, 404.1546(c), step five cannot be affirmed in this appeal. *See Young,* 362 F.3d at 1003-05. The remedy for the shortcomings noted herein is further consideration, not an award of benefits.

## IV. CONCLUSION

For the reasons stated above, the Court REVERSES the Commissioner's decision and REMANDS this matter to the Commissioner for further proceedings consistent with this opinion.

SO ORDERED.

ENTERED: February 27, 2018

/s/ JON E. DEGUILIO<br>
Judge<br>
United States District Court

---

[9] Admittedly, the Seventh Circuit has occasionally concluded that a VE has familiarity with the claimant's limitations, despite any gaps in the hypothetical, when the record shows that the VE independently reviewed the medical record or heard testimony directly addressing those limitations and the VE considered that evidence when indicating the type of work the claimant is capable of performing. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, n. 5 (7th Cir. 2010) (citing *Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009); *Young*, 362 F.3d at 1003; *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002); *Ragsdale v. Shalala*, 53 F.3d 816, 819-21 (7th Cir. 1995); *Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 540 (7th Cir. 1992)). This exception does not apply here, since the VE never indicated having reviewed Ms. Donald's medical records, nor did he indicate in his responses having relied on those records or the hearing testimony. Rather, the VE's attention was on the limitations of the hypothetical person posed by the ALJ, and not on the record itself or the limitations of the claimant herself. *Id.* (citing *Simila*, 573 F.3d at 521; *Young*, 362 F.3d at 1003).